IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK ALAN LAFORGE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 1:13-cv-02219 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | Hon. John E. Jones III |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**September 22, 2014**

**Introduction**

Plaintiff Mark Alan Laforge has filed this action seeking review of a

decision of the Commissioner of Social Security ("Commissioner") denying

Laforge's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is

disabled and "insured," that is, the individual has worked long enough and paid

social security taxes.  Laforge met the insured status requirements of the Social

Security Act through December 31, 2014.  Tr. 47.[1]

---

[1] References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of
the Defendant's Answer.

Laforge filed his application for disability insurance benefits on August 4, 2010, alleging that he became disabled on September 21, 2009. Tr. 106. Laforge had been diagnosed with several impairments, including depression, obesity, "chronic back pain," a herniated disc of the lumbar spine, sciatica, and lumbar radiculopathy. Tr. 47, 232, 344. On October 5, 2010, Laforge's application was initially denied by the Bureau of Disability Determination. Tr. 61.

A hearing was conducted by an administrative law judge ("ALJ") on October 11, 2011, where Laforge was represented by counsel. Tr. 13-39. On November 10, 2011, the ALJ issued a decision denying Laforge's application. Tr. 45-54. On June 7, 2013, the Appeals Council declined to grant review. Tr. 1. Laforge filed a complaint before this Court on August 23, 2013, and this case became ripe for disposition on February 4, 2014, when Laforge filed a reply brief.

Laforge appeals the ALJ's determination on three grounds: (1) the ALJ erred in rejecting the opinions of Laforge's treating physicians, (2) the ALJ improperly discounted Laforge's credibility, and (3) the determination at step five of the evaluation process was not supported by substantial evidence. For the reasons set forth below, this case is remanded to the Commissioner for further proceedings.

**Statement of Relevant Facts**

Laforge was forty-nine years of age at the time the ALJ rendered his decision; he has a high school education, and is able to read, write, speak and

understand the English language.  Tr. 132, 134.  Laforge's past relevant work experience included work as: a machine operator, which is classified as medium, skilled work; a material handler, which is classified as heavy, semiskilled work; a forklift operator, which is medium, semiskilled work; a wood worker, which is medium, semiskilled work; and as a warehouse worker, which is medium, unskilled work.  Tr. 28-29.

### A.    Laforge's Physical Impairments

Laforge presented to the Orange Regional Medical Center emergency room on September 21, 2009, complaining that he had "pulled his back out" while lifting boxes at work.  Tr. 198-219.  Laforge had positive bilateral paralumbar tenderness. Tr. 199.  His gait was normal, he had a negative bilateral straight leg test, no lower extremity weakness, and his strength and reflexes were within normal limits.  Id. Laforge was also able to move all of his extremities without difficulty.  Tr. 216.

On September 24, 2009, Laforge was examined by his treating physician, Alexander Gapay, M.D.  Tr. 297.  Laforge reported pain in his lower back that radiated to the lower left extremity.  Id.  Dr. Gapay noted significant muscle spasms and pain in the lumbar spine.  Tr. 298.  Laforge's ability to flex his hip reduced by fifty percent, he experienced pain during heel-to-toe walking, and a straight leg raise test was positive on the left side.  Id.

X-rays taken that day revealed no evidence of fracture or dislocation, and Laforge's intervertebral disc spaces were "well preserved at all levels." Tr. 296. The x-rays did show several large osteophytes in the lower thoracic region at the T10-11, T11-12, and T12-L1 levels, as well as a "loss of height of the T11 vertebral body" which was indicative of a fracture. Id. On October 8, 2009, an MRI was performed on Laforge's lumbar spine. Tr. 307. The MRI demonstrated a small foraminal disc herniation at the L4-5 level, which caused "slight left foraminal narrowing in the region of the exiting L4 nerve root." Id.

On October 12, 2009,[2] Laforge reported that he continued to experience low back pain ranging from a four out of ten to a ten out of ten. Tr. 308. Laforge had tenderness between the L4 and S1 vertebrae, his lumbar flexion range of motion was limited to fifty percent its normal range, and he experienced pain with heel-to-toe walking. Tr. 309. Dr. Gapay diagnosed Laforge with a herniated disc[3] at the L4-5 lumbar spine level. Id.

On October 26, 2009 Dr. Gapay noted that Laforge had a positive straight leg raise test on the left side, pain at the L4-S1 region, and 1+ reflexes in the lower extremities. Tr. 314. Laforge's lumbar flexion and extension range of motion was

---

[2] Around this time, Laforge began attending physical therapy sessions with Mark Monto, PT. Tr. 310. Laforge attended six physical therapy sessions between October 14, 2009 and November 4, 2009. Tr. 310-12, 315-16, 320.

[3] "A herniated disk can irritate nearby nerves and result in pain, numbness or weakness in an arm or leg." Mayoclinic.org, Herniated Disk Definition, *available at* http://www.mayoclinic.org/diseases-conditions/herniated-disk/basics/definition/con-20029957 (last visited September 18, 2014).

limited to less than half its normal range, he was able to flex his hip to less than

fifty percent of normal, and he experienced discomfort during heel-to-toe walking.

Id.  Laforge complained that his radiating low back pain occasionally reached ten

out of ten; he had trouble getting out of bed and tying his shoes.  Tr. 313.  Dr.

Gapay noted that physical therapy was not helping significantly and medications

were not effective in controlling Laforge's pain.  Tr. 314.  He opined that Laforge

had a "constant relationship" with pain, and had a marked partial disability.  Id.

On November 4, 2009, Laforge presented to Sushil Dhawan, M.D. for an

orthopedic consultation. Tr. 317.  Laforge stated that his low back pain level was a

four or five out of ten; this pain radiated to his lower left extremity.  Id.  A straight

leg raise test was positive for pain at seventy degrees on the left side, and there was

tenderness in the lumbosacral region.  Tr. 318.  Laforge's range of motion in his

lumbar spine was reduced to: forty-five degrees out of sixty in the flexion; fifteen

degrees out of twenty-five in the extension; twenty degrees out of twenty-five in

the right lateral flexion; and fifteen degrees out of twenty-five in the left lateral

flexion.  Id.  Laforge had five out of five strength, 2+ reflexes, and no sensory

deficits.  Id.

On November 6, 2009, Laforge presented to Thomas Colavito, D.C. for an

initial chiropractic evaluation.  Tr. 511.  Laforge experienced pain in his lumbar

region and left leg, as well as numbness and tingling in his left leg.  Tr. 512.

Laforge had weakness in his heel walk and toe extension, pain and tenderness in his lumbar region, and a restricted range of motion in his lumbar flexion.  Tr. 512-13.  Dr. Colavito noted that Laforge limped when he walked, and opined that Laforge was unable to return to work.  Tr. 513-14.

A November 7, 2009 x-ray of the lumbosacral spine revealed adequately maintained intervertebral disc spaces and no evidence of fracture.  Tr. 321.  The x-ray did demonstrate a mild spinal curve abnormality and mild degenerative anterior spurring at the T12-L1 level.  Id.

On November 16 and 18, 2009, Laforge presented to Dr. Gapay complaining of radiating pain ranging from five to eight out of ten.  Tr. 322, 327.  Laforge also complained that his medication made him drowsy.  Tr. 327.  On November 16, Laforge's hip flex was less than fifty percent normal; by November 18 it was less than twenty-five percent normal.  Tr. 323, 328.  Dr. Gapay diagnosed Laforge with left neuroforaminal stenosis[4] accompanied by radiculopathy.[5]  Tr. 323, 328.

---

[4] Stenosis is "a narrowing of the open spaces within [the] spine . . . stenosis can cause pain, numbness, muscle weakness, and problems with bladder or bowel function." Mayoclinic.org, Spinal Stenosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited September 18, 2014).

[5] "Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes)." Zerbe v. Colvin, 3:12-CV-01831, 2014 WL 2892389, at n.6 (M.D. Pa. June 26, 2014) (citations omitted).

On November 17, 2009, Laforge presented to Vladimir Salomen, M.D. for a pain management consultation. Tr. 324. Dr. Salomen noted a decreased range of motion in the lumbar flexion; Laforge had a normal range of motion in the lumbar extension, though he did experience pain at the end of the motion. Tr. 326. A straight leg raise test was positive on the left side and a slump test was positive, though Laforge had 4+ out of 5 strength in his lower extremities. Id. Dr. Salomen diagnosed Laforge with low back pain "likely secondary to left L5 radiculopathy" and scheduled Laforge for an epidural steroid injection which was performed on December 17, 2009. Id., tr. 332. Dr. Salomen prescribed Ryzolt and Ultram for the pain. Id.

On December 31, 2009, Laforge reported that his pain still reached ten out of ten at times, and Dr. Gapay noted that Laforge had "limited ambulation [and] every time he [took a step] the pain seemed to get worse in the left lower extremity." Tr. 333. Dr. Gapay noted pain and tenderness at the L4 to S1 region; Laforge's lumbar flexion range of motion was reduced by more than half and he had difficulty with heel-to-toe walking. Tr. 334. Dr. Gapay noted that the previous epidural injection had provided no relief. Id.

On January 4, 2010, Laforge presented to David Drier, D.C. for a Worker's Compensation independent medical chiropractic examination. Tr. 274. Laforge complained that his radiating low back pain was exacerbated by walking or

prolonged sitting.  Tr. 275.  Laforge ambulated well and "moved about without any difficulty" although he turned over on the table with some pain and discomfort.  Id. Dr. Drier noted moderate muscle spasms in the lumbar spine, but a straight leg raise test was negative bilaterally.  Id.  Laforge's lumbar flexion range of motion was reduced by sixty-seven percent and was accompanied by pain.  Id.  Laforge had normal sensation and full strength throughout.  Tr. 276.

Dr. Drier opined that objective evidence partially substantiated Laforge's subjective symptoms, and opined that Laforge had a moderate to marked partial disability.  Id.  Dr. Drier believed that Laforge could lift up to twenty pounds, though he could not bend, stoop, or twist.  Id.  Dr. Drier further limited Laforge to sitting or standing for less than twenty minutes at a time.  Id.

On January 13, 2010, Laforge presented to Dr. Dhawan for a follow-up appointment, and to Jeffrey Degen, M.D. for an initial appointment.  Tr. 224-25, 335-37.  Laforge's pain level was a seven or eight out of ten; he reported that physical therapy, chiropractic treatment, and epidural injections all failed to provide relief from this pain.  Tr. 224, 335.  Laforge had five of five strength throughout and 2+ reflexes, as well as intact sensation.  Tr. 224, 336.  A straight leg test was positive for pain at seventy degrees on the left side; he had a slightly antalgic gait, a painful and limited range of motion in all extremes, and difficulty with toe walking due to pain.  Id.

Dr. Dhawan opined that conservative treatment was not helping; he referred Laforge for surgical consultation and recommended continued use of a TENS unit and back brace.  Tr. 336-37.  Dr. Degen stated that Laforge's October 8, 2009 MRI showed mild foraminal narrowing that "clearly" did not impinge on the L4 nerve root.  Tr. 224.  Dr. Degen opined that "a lumbar decompression [was unlikely] to improve [Laforge's] symptomology."  Tr. 225.

On February 3, 2010, Laforge returned to Dr. Dhawan, reporting minimal pain relief after his epidural injection.  Tr. 338.  Laforge had a full range of motion in his lower extremities, but his lumbar flexion range of motion was decreased due to pain.  Tr. 340.  A straight leg raise test was positive on the left side, and Laforge had a mildly decreased sensation to light touch along the lateral left thigh.  Id.

On March 18, 2010, Laforge reported pain after sitting for ten minutes; he reported being able to walk for one block at most, and being unable to perform many activities around the house due to pain.  Tr. 342.  Dr. Gapay noted that Laforge had some difficulty ambulating.  Tr. 343.  Laforge had difficulty with heel-to-toe walking, he was able to bend at the hips to less than fifty percent of his normal range, and he had tenderness at the L4 to S1 region.  Tr. 344.  Dr. Gapay noted that a recent EMG test[6] revealed radiculopathy at the L5 level and opined

---

[6] The actual EMG test results are not contained within the administrative record.

that this finding was "compatible with [Laforge's] injuries and . . . history." Id.
Dr. Gapay diagnosed Laforge with lumbar radiculopathy.  Tr. 227.

On April 29, 2010, Dr. Salomen administered a second epidural steroid
injection.  Tr. 345.  At a May 18, 2010 follow-up, Laforge reported that the
epidural injection had provided thirty percent pain relief for a short duration.  Tr.
346.  Laforge again reported "chronic drowsiness" due to his pain medication.  Id.
Laforge had full strength in his lower extremities and intact sensation; however, a
straight leg raise test was positive on the left side and Laforge had a mildly antalgic
gait.  Tr. 347.  Dr. Salomen diagnosed Laforge with radiculopathy.  Id.

On May 27, 2010, Laforge reported that his radiating low back pain had
become constant; the pain level typically reached six or seven out of ten.  Tr. 349.
Laforge stated that he had limited activities of daily living, a limited ability to
walk, stand, sit, and climb stairs, and a limited ability to drive and do chores.  Id.
Dr. Gapay noted that Laforge walked with a limp.  Id.  Laforge had pain,
tenderness, and spasms in the lumbosacral spine and a limited range of motion in
the lumbar flexion and extension.  Tr. 350.  He had no motor or sensory loss.  Id.

On June 4, 2010, Laforge returned to Dr. Drier for a second Worker's
Compensation independent medical chiropractic examination.  Tr. 269.  Dr. Drier
noted that Laforge ambulated without difficulty but did experience pain and
difficulty turning over on the examination table.  Tr. 271.  Laforge had moderate

spasms in the lumbar spine and pain with heel-to-toe walking, though a straight leg test was negative bilaterally.  Id.  Laforge's lumbar flexion range of motion was reduced by sixty-seven percent.  Id.  Laforge had five of five strength and 2+ reflexes in the ankles.  Id.

Dr. Drier believed that Laforge's subjective symptoms were partially substantiated by objective findings and opined that Laforge had a moderate partial disability.  Tr. 272.  Dr. Drier opined that Laforge could lift up to twenty-five pounds, but should not bend, stoop, or twist repetitively, and should not stand or sit for more than twenty-five minutes at a time.  Id.  Dr. Drier believed that Laforge had reached maximum medical improvement and opined that active chiropractic treatment was no longer necessary.  Id.

On July 8, 2010, Laforge returned to Dr. Gapay for a follow-up appointment.  Tr. 352.  Laforge reported seven out of ten pain in his lower back radiating into his lower left extremity.  Id.  Laforge also reported a limited ability to walk, stand, and sit due to pain.  Id.  Dr. Gapay noted that Laforge had difficulty ambulating, had pain and tenderness in the lumbosacral spine, and was not able to bend at the hip due to "significant pain and spasm."  Tr. 353.  Dr. Gapay diagnosed Laforge with a herniated disc at the L4-5 level and radiculopathy.  Id.

On July 12, 2010, Laforge presented to Neal Dunkelman, M.D.  Tr. 381.  Dr. Dunkelman noted palpable muscle spasms in the lumbar spine, a limited range of

motion, symmetric reflexes, and intact sensation and strength.  Tr. 383.  Dr.

Dunkelman opined that Laforge's prognosis was fair, and believed that Laforge's

complaints were consistent with his injury history and objective findings.  Id.  Dr.

Dunkelman believed that Laforge had exhausted most treatment modalities, and

diagnosed him with lumbosacral radiculopathy.  Tr. 385.  Laforge continued

treatment with Dr. Dunkelman through February 2, 2011.  Tr. 516-24.  Dr.

Dunkelman continually noted that straight leg raise tests were positive, tenderness

was presented, and Laforge's lumbar range of motion was restricted.  Id.

### B.     Residual Functional Capacity Assessments

On October 5, 2010, Elizabeth Kamenar, M.D. reviewed Laforge's medical

records and completed a physical residual functional capacity assessment.  Tr. 419-

25.  Dr. Kamenar opined that Laforge was capable of occasionally lifting or

carrying twenty pounds and frequently lifting or carrying ten pounds.  Tr. 420.  Dr.

Kamenar believed that Laforge could occasionally balance, stoop, kneel, crouch,

crawl, and climb ramps or stairs, though he could never climb ladders, ropes, or

scaffolds.  Tr. 421.  Dr. Kamenar further opined that Laforge must avoid

concentrated exposure to extreme cold, humidity, vibration, pulmonary irritants,

and hazards such as machinery and heights.  Tr. 422.

On May 9, 2011, Dr. Dunkelman opined that Laforge could occasionally lift

or carry ten pounds.  Tr. 540.  Laforge could sit for forty-five minutes at a time, for

a maximum of four hours throughout an eight-hour workday.  Tr. 541.  Laforge

could stand for twenty minutes at a time for up to one hour in a workday and could

walk for twenty minutes at a time for up to three hours during a workday.  Id.

Dr. Dunkelman believed that Laforge was limited in using his right hand to

occasionally reach, never push or pull, and frequently handle, finger, or feel.  Tr.

542.  With his left hand, Laforge could occasionally reach, feel, push, or pull, and

could frequently handle or finger.  Id.  Dr. Dunkelman opined that Laforge could

only occasionally operate foot controls with his left foot.  Id.  Dr. Dunkelman

believed that Laforge could never balance, stoop, kneel, crouch, or climb ladders

or scaffolds; he could occasionally climb stairs or ramps.  Tr. 543.  Laforge should

never be exposed to extreme cold or unprotected heights; he could occasionally be

around moving machinery, humidity and wetness, pulmonary irritants, vibrations,

or extreme heat.  Tr. 544.

Throughout their time treating Laforge, Dr. Dhawan, Dr. Gapay, Dr.

Salomen, Dr. Colavito, and Dr. Dunkelman continuously completed forms for

Worker's Compensation indicating that Laforge was completely disabled.  Tr. 220-

47, 258-68, 426-510, 517-28, 546-53.

## C.   The Administrative Hearing

On October 11, 2011, Laforge's administrative hearing was conducted.  Tr.

13-39.  At that hearing, Laforge testified that he continued to have problems with

low back pain, such that sitting was painful for him.  Tr. 17.  Laforge stated that

medication helped take "the edge off" but did not significantly relieve his pain; on

a typical day his pain would rate as a six out of ten.  Tr. 18, 22.  On a bad day,

Laforge as unable to even get out of bed.  Tr. 23.  Laforge's medications made him

"foggy," made it difficult to focus, and gave him headaches.  Tr. 22, 25.

When asked what he could lift and carry, Laforge stated "I can't bend over

and pick up anything. But I can slide something off the table. I'd say, you know,

between 10 and 20 pounds that I can hold that. As far as bending, anything up off

the floor, picking anything up is out of the question."  Tr. 18.  Laforge could walk

for approximately one block, could stand for fifteen minutes at a time, and could

sit for twenty minutes at a time.  Tr. 18-19.

Laforge had a young son but testified Laforge's four sisters, two brother, and

mother helped care for his son.  Tr. 20.  On a typical day, Laforge would get his

child cereal in the morning and pack a lunch.  Tr. 21.  After his son left for school,

Laforge would "putsy" around, doing some chores for a little while before taking a

break.  Tr. 19, 21.  Laforge did not have hobbies other than watching television,

and generally had to spend the day in a reclined position due to his pain.  Tr. 24.

After Laforge testified, Gerry Keating, an impartial vocational expert, was

called to give testimony.  Tr. 28.  The ALJ asked Mr. Keating to assume a

hypothetical individual with Laforge's age, education, and work experience who

was limited to light work,[7] but could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  Tr. 29-30.  Furthermore, the hypothetical individual must "avoid heavy concentrations of cold, high humidity, vibrations, heavy concentrations of dust, fumes, gases, and various hazards such as unprotected heights [and] dangerous machinery."  Tr. 30.  Additionally, there was a "moderate impact in terms of maintaining concentration, persistence, and pace."  Id.

Mr. Keating opined that, given these restrictions, the hypothetical individual would be unable to perform Laforge's past relevant work.  Id.  However, the individual would be capable of performing three jobs that exist in significant numbers in the national economy: a marker/tagger/labeler, a cashier II, and a stock checker.  Tr. 30-31. Mr. Keating testified that, if an individual were limited to sedentary work and could only sit for four hours, stand for one hour, and walk for three hours during a workday, that individual would be unemployable.  Tr. 36-37.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must

---

[7] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain

evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the

record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability

insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc.

Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner

to consider, in sequence, whether a claimant (1) is engaging in substantial gainful

activity, (2) has an impairment that is severe or a combination of impairments that

is severe, (3) has an impairment or combination of impairments that meets or

equals the requirements of a listed impairment, (4) has the residual functional

capacity to return to his or her past work and (5) if not, whether he or she can

perform other work in the national economy.  See 20 C.F.R. § 404.1520.   The

initial burden to prove disability and inability to engage in past relevant work rests

on the claimant; if the claimant meets this burden, the burden then shifts to the

Commissioner to show that a job or jobs exist in the national economy that a

person with the claimant's abilities, age, education, and work experience can

perform.  Mason, 994 F.2d at 1064.

A.     **The ALJ's Evaluation of Treating Physician Opinions**

On appeal, Laforge primarily argues that the ALJ erred in failing to accord

greater weight to the opinion of his treating physicians.  Laforge contends that the

17

ALJ should have given controlling, or at least significant, weight to the residual functional capacity assessment offered by Dr. Dunkelman, as well as the opinions of other treating physicians that Laforge was disabled.  The Commissioner asserts that the ALJ gave sufficient reasons for discounting these opinions.

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).   When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir.1999)).

In choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Morales, 225 F.3d at 317-18.  The Third Circuit "has 'consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician[.]'"  Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 357 (3d Cir. 2008) (quoting Dorf v. Bowen, 794 F.2d 896, 901 (3d Cir.1986)).

The ALJ wholly rejected Dr. Dunkelman's opinion on the basis that it (1) was "not consistent with the other medical evidence of record" and (2) was not "consistent with [Laforge's] own testimony" that he could lift up to twenty pounds. Tr. 51-52.  Neither reason was proper.

The ALJ's conclusion that Dr. Dunkelman's opinion was inconsistent with Laforge's testimony does not withstand scrutiny.  Dr. Dunkelman opined that Laforge was capable of occasionally lifting and carrying up to ten pounds for up to one-third of an eight-hour workday, every day during a five-day workweek.  Tr. 540.  Laforge testified that he could "hold" a ten to twenty pound object a waist level; he could not lift an object off of the floor.  Tr. 18.  Laforge did not state that he was able to both lift and carry twenty pounds.  Laforge did not testify for how long he was capable of lifting and carrying ten to twenty pounds.  He did not state that he could carry twenty pounds for up to one-third of a workday, nor did he state that he could carry ten pounds for up to two-thirds of a workday, as would be required to perform light work.  Laforge did not testify that he could lift and carry ten to twenty pounds every day during an entire workweek.

Additionally, the ALJ did not acknowledge that Laforge had previously stated he could only lift ten pounds.  Tr. 149.  Thus, while Laforge's testimony may at first blush appear inconsistent with Dr. Dunkelman's assessment, without further development of Laforge's testimony it is not possible to conclude that the

opinion is inconsistent with Laforge's testimony.  Consequently, Laforge's single, isolated statement is not sufficient to discredit Dr. Dunkelman's opinion either as a whole, or as it relates to Laforge's ability to perform only sedentary work.

Furthermore, the ALJ's conclusion that Dr. Dunkelman's opinion was not consistent with the administrative record as a whole is not supported by substantial evidence.  The ALJ's limited discussion relating to purported inconsistencies between the record and Dr. Dunkelman's opinion does not permit adequate review of the ALJ's findings.  The ALJ's conclusory statement may have sufficed had he discussed all of the relevant evidence.  However, the ALJ omitted discussion of almost all evidence that supported Dr. Dunkelman's opinion.  For example, the ALJ omitted any mention of numerous positive straight leg raise tests.  Tr. 298, 314, 318, 326, 336, 340, 347, 516-24.  The ALJ did not acknowledge multiple notations made by several doctors that Laforge walked with a limp or had an abnormal gait.  Tr. 224, 347, 349, 513.  The ALJ failed to mention the EMG test that confirmed Laforge suffered from lumbar radiculopathy, a diagnosis that was consistent with his symptoms and complaints.  Tr. 344.  The ALJ failed to mention multiple diagnoses of lumbar radiculopathy and sciatica.  Tr. 227, 228, 322, 326, 328, 332, 344, 346, 381, 385.

Such relevant evidence may well have supported Dr. Dunkelman's conclusions, and certainly was not inconsistent with his findings and opinion.

Without any discussion of this evidence, it cannot be determined "if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).  Consequently, the ALJ's decision to discredit Dr. Dunkelman's opinion was not supported by substantial evidence.[8]

### B.     Evaluation of Laforge's Credibility

"Allegations of pain and other subjective symptoms must be supported by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529).  Where an ALJ reaches a credibility determination, that determination is entitled to deference by the district court because the ALJ "has the opportunity at a hearing to assess a witness's demeanor." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  However, credibility determinations are only accorded such deference when there is a "sufficient basis" for that determination.  Izzo v. Comm'r of Soc. Sec., 186 F. App'x 280, 286 (3d Cir. 2006) (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999)).

The ALJ found that Laforge's medically determinable impairments could reasonably cause his alleged symptoms, but his statements concerning the intensity, persistence and limiting effects of those symptoms were not credible.  Tr. 50.  Specifically, the ALJ stated that "the objective evidence fails to support the

---

[8] Laforge also challenges the ALJ's decision to reject forms from treating physicians opining that Laforge was disabled.  However, the determination of a claimant's disability is solely the ALJ's responsibility, and an opinion that a claimant is disabled is not entitled to any special weight. See, SSR 96-5p. Consequently, even if the ALJ improperly rejected those opinions, any error would have been harmless.

severity of [Laforge's] symptoms and alleged limitations." Tr. 51. This determination was based on an incomplete and faulty analysis of all of Laforge's medically determinable impairments, as well as the administrative record as a whole.

As discussed previously, the ALJ neglected to analyze or address a significant amount of objective evidence that supported Laforge's subjective complaints. The ALJ also failed to discuss Laforge's diagnosis of lumbar radiculopathy; the failure to address this impairment, or to give an adequate explanation for discounting it, draws into question the ALJ's assessment of Laforge's credibility. See, e.g., Shannon v. Astrue, 4:11-CV-00289, 2012 WL 1205816, at *10 (M.D. Pa. April 11, 2012); Bell v. Colvin, 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013); Stape v. Colvin, Civil No. 3:13-CV-02308, 2014 WL 1452977, at *6 (M.D. Pa. April 14, 2014); Russell-Harvey v. Colvin, 3:12-CV-00953, 2014 WL 2459681, at *9-10 (M.D. Pa. May 29, 2014).

Additionally, the ALJ failed to mention, evaluate, or weigh the third party statement submitted by Laforge's mother. Tr. 155-162. Third party statements bolster a claimant's credibility, and failure to address such statements renders the ALJ's credibility determination defective. See, Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000). See also, Maellaro v. Colvin, 3:12-CV-01560, 2014 WL 2770717, at *11-12 (M.D. Pa. June 18, 2014).

Finally, the ALJ failed to address Laforge's complaints regarding medication side effects.  Not only did Laforge testify to side effects relating to his use of medication, but he also noted these side effects in his functional capacity report, and complained of side effects to his doctors.  Tr. 22, 25, 146, 327, 346. The ALJ's failure to evaluate Laforge's complaints of medication side effects further detracts from the validity of the ALJ's credibility assessment.  See, Stewart v. Sec'y of Health, Educ. & Welfare of U.S., 714 F.2d 287, 291 (3d Cir. 1983) ("In view of the ALJ's complete failure to explain whether . . . testimony concerning the effects of [claimant's] medication was not credited or simply ignored, and his failure to offer any justification for his action, we will remand the case to the district court . . .").  See also, Jury v. Colvin, 3:12-CV-2002, 2014 WL 1028439, at *9 (M.D.  Pa. Mar. 14, 2014);  Lickenfelt v. Astrue, CIV.A. 07-0958, 2008 WL 2275538, at *11 (W.D. Pa. May 30, 2008);  Weber v. Barnhart, CIV.A. 05-1589, 2005 WL 2862235, at *4 (E.D. Pa. Oct. 28, 2005).

Although deference is properly owed to an ALJ's credibility determination, in this instance that determination lacked adequate evidentiary support.  The ALJ's failure to address relevant evidence and diagnoses, combined with the failure to address the third party statement submitted by Laforge's mother and failure to address Laforge's complaints of medication side effects rendered the ALJ's credibility determination defective and unsupported by substantial evidence.

C.      **The ALJ's Decision at Step Five**

"A hypothetical question posed to a vocational expert "must reflect *all* of a claimant's impairments." Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (quoting Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir.1987)) (emphasis in original).  "Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." Id. (citing Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)).

The ALJ posed a hypothetical question to the vocational expert that reflected the ALJ's ultimate residual functional capacity determination.  Tr. 29-30.  In response, the vocational expert offered three jobs that Laforge could perform that exist in significant numbers within the national economy.  Tr. 30-31.  However, as previously discussed, the ALJ's residual functional capacity determination was not supported by substantial evidence.  Consequently, the vocational expert's testimony based upon that determination was likewise flawed, and the ALJ's decision at step five of the sequential evaluation process was not supported by substantial evidence.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  Pursuant to 42 U.S.C. §

405(g), the decision of the Commissioner is vacated, and this case is remanded for

further proceedings.

An appropriate Order will be entered.